# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2878 | **DATE** | 5/19/2003 |
| **CASE TITLE** | | Maxwell-Perkins v. Principi | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached memorandum opinion and order, the Defendant's Motion for Summary Judgment [6-1] is GRANTED in its entirety. This case is closed.

(11) ■ [For further detail see attached memorandum opinion and order.]

| | | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | MAY 2 2 2003 | | | 19 |
| ✓ | Docketing to mail notices. | date docketed | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| mds(lc) | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| JUDY MAXWELL-PERKINS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02 C 2878 |
| v. | ) | |
| | ) | HONORABLE DAVID H. COAR |
| ANTHONY J. PRINCIPI, Secretary, | ) | |
| Department of Veterans Affairs, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is an employment discrimination and retaliation case. Plaintiff Judy Maxwell-Perkins ("Plaintiff" or "Maxwell-Perkins") alleges that her employer, the Department of Veterans Affairs ("VA") discriminated against her in her employment with the Department of Veterans Affairs Medical Center, Hines ("Hines VA") because of her gender in requiring her to wear a uniform and then retaliated against her for engaging in protected expression. Before this Court is Defendant's Motion for Summary Judgment. For the following reasons, Defendant's motion is GRANTED.

### I. Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); see also Schmidt v. Ottawa Medical Center, P.C., 322 F.3d 461, 463 (7th Cir. 2003). When evaluating a motion for summary judgment, the Court

1



views the evidence in the light most favorable to the non-moving party and makes all reasonable

inferences in her favor. See Haywood v. Lucent Technologies, 323 F.3d 524, 529 (7th Cir.

2003).

It is the moving party's burden to demonstrate the absence of genuine issues of material

fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hedberg v. Indiana Bell Tel.

Co., 47 F.3d 928, 931 (7th Cir. 1995). If the moving party meets this burden, the non-moving

party must set forth specific facts that demonstrate the existence of a genuine issue for trial. Rule

56(e); Celotex, 477 U.S. at 324. To successfully oppose the motion for summary judgment, the

non-moving party cannot rest on the pleadings alone, but must designate specific facts in

affidavits, depositions, answers to interrogatories or admissions that establish that there is a

genuine triable issue. Selan v. Kiley, 969 F.2d 560, 564 (7th Cir. 1992).

## II. Background[1]

In January 2000, Plaintiff was one of five Housekeeping Aide Section Chiefs--and the

only female--in the Environmental Management Service ("EMS") at the Hines VA. The other

four chiefs were male: Martin Anderson, Robert E. Dunson, Sandre D. Sparks, and James C.

York. Anderson has worked in EMS at the Hines VA for nearly 27 years; Dunson has worked

---

[1] Unless otherwise indicated, the following facts are undisputed and are taken from the parties' Local Rule 56.1 materials. This Court disregarded responses or portions of responses that either 1) were unsupported by the portion of the record cited or 2) improperly contained argument instead of concise admissions or denials, as required by Local Rule 56.1, which this Court strictly enforces. Further, statements and responses that are unsupported by the record are disregarded. See Johnson v. Indopco, Inc., 887 F.Supp. 1092, 1095 (N.D. Ill. 1995). "[A] lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." Greer v. Bd. of Educ., 267 F.3d 723, 727 (7th Cir. 2001).

2

over 31 years; Sparks has worked over 29 years; and York has worked over 25 years.

In July 1998, Plaintiff became a Housekeeping Aide Section Chief. She had worked regularly as a housekeeping aide from June 1985 until December 27, 1990. On December 27, 1990, Plaintiff had an injury on the job, which ultimately resulted in her returning to work several months later with medical restrictions. Her injury occurred while she was working in a room where a piece of duct work from the ceiling fell. Plaintiff experienced a right shoulder rotator cuff tear, stress, and anxiety.

In 1999, Plaintiff was a section chief in the main hospital. Her duties included preparing reports, approving leave, assigning and inspecting the work of the housekeeping aides, and training. Anderson also worked in the mail hospital. Karl Williams, a male, assumed the position of Acting Chief of EMS in November 1999; the section chiefs reported to him. When Williams took over the position, he made several changes. For example, he met directly with the housekeeping staff; moved the service from the basement to an upper floor; developed a control deck and changed the check-in system for the housekeeping aides.[2] Williams did not have a background in environmental services and he asked Sparks and Dunson to help him by functioning as liaisons with the housekeeping staff and supervisors. Williams delegated authority to them for various projects. For example, Sparks and Dunson helped him with the flow of information, training, handling of Y2K computer issues, and scheduling matters. As a result, Sparks and Dunson worked flexible shifts, as they also attended meetings in Williams' place and acted as chief in his absence.

---

[2] Plaintiff denies that Williams initiated all of these changes. Namely, she states that the former chief, Terrence Wright, met directly with staff and changed the location of housekeeping.

3

On January 6, 2000, Williams issued a Delegation of Authority Memorandum to EMS personnel, which restated the "approved delegation of line authority as it pertain[ed] to the day-to-day operation of EMS." Sparks and Dunson were identified in the Memorandum as the "second line of supervision" under Williams. Maxwell-Perkins acknowledges that, when Sparks and Dunson performed additional duties, they did so because Williams relied on them.

**The Uniform Requirement and Detail**

The Chief of Services had discretion to require EMS supervisors, including section chiefs, to wear uniforms. For many years, uniforms had been optional for housekeeping section chiefs like Plaintiff and historically, section chiefs did not wear them. After becoming Acting Chief of EMS, Williams changed the uniform practice to require section chiefs to wear uniforms when performing housekeeping duties. According to Williams, he wanted section chiefs to wear uniforms while training staff and performing housekeeping duties in the hospital/clinic areas for identification purposes and uniformity. He also decided that the uniform requirement would help boost the morale of the housekeeping aides and improve the relationship between the supervisors and their staff.

In January 2000, Williams gave initial verbal instruction that section chiefs wear uniforms when he instructed Dunson to inform Anderson and Maxwell-Perkins to begin wearing uniforms. On April 10, 2000, Williams issued a written memorandum, directing all EMS Section Chiefs to be in uniform by April 17, 2000.

Other section chiefs--Anderson, Dunson, and Sparks--wore uniforms. Plaintiff admits that she saw Anderson working in uniform during the period January through March 2000, although she also states that she observed him not in uniform on occasion. Dunson wore a

4

uniform during this same time period when he performed housekeeping duties, and he observed Anderson and Sparks wearing uniforms as well. Plaintiff states that Dunson wore a uniform "sporadically."[3] Dunson and Sparks, however, did not wear uniforms when they attended management meetings or worked on other non-routine assignments. York, another section chief, was on detail to engineering in January 2000, so the uniform policy was not an issue for him.

Maxwell-Perkins never complied with the uniform requirement. She believes that Williams required her to wear a uniform because it "was just a personal thing," meaning that he did not like her as a person. She also believes that the uniform requirement goes back "some 15 years ago where this man [Williams] is still being petty because I turned him down back then, and this was his way of getting back for something so long ago."

On January 11, 2000, the day after Dunson told Maxwell-Perkins to get fitted for a uniform, at approximately 10:15 a.m., Plaintiff went to the employee health unit where she reported having an anxiety attack. The nurse recommended that Plaintiff go home and follow-up with her physician. Williams approved Maxwell-Perkins sick leave that afternoon. Sometime thereafter, Plaintiff provided a letter to Williams from her physician, William Sarantos, M.D., stating that she had anxiety over wearing a housekeeping uniform and that he advised her not to wear one. Williams received the letter for consideration.

Following the advice of Claire Hajduk in Human Resources, Maxwell-Perkins asked Williams to extend the date on which she needed to be in uniform so that she could get additional

[3]At some point, Maxwell-Perkins asked Williams why Dunson did not have to wear a uniform in late January or early February, and Williams told her "Don't question who's in uniform and who is not. I decide who will be in uniform and who will not be in uniform." Defendant disputes this.

medical evaluation and counseling. Williams gave her the time she requested. Plaintiff began seeing Dr. Patras, a psychologist, who on February 5, 2000, wrote a note stating that Maxwell-Perkins had "depression with anxiety [. . . and it was] necessary for her to be reasonably accommodated."

After conferring with Personnel, Williams sent Plaintiff a letter on March 1, 2000. The letter explained that the medical documentation Maxwell-Perkins submitted was unacceptable because "it did not indicate whether or not [she was] currently being treated or the length of time the accommodation would be required." The letter also outlined the specific medical information required in a physician's statement. The letter informed Plaintiff that a determination on her request could not be made without this medical information, and that, in the interim, Plaintiff would be assigned to the Laundry as a temporary accommodation.

On March 9, 2000, Maxwell-Perkins submitted a statement from Dr. Patras. According to Defendants, the letter did not include sufficient information as stipulated in the March 1 letter. Plaintiff contends that she was never informed that Dr. Patras' statement was insufficient. As of April 17, 2000, Plaintiff believed that she could not and would not wear a uniform because of her medical condition.[4]

---

[4]In the early 1990s, when Anderson was Plaintiff's section chief, he and the assistant chief allowed Plaintiff not to wear her uniform when she provided a medical statement that they gave her anxiety attacks.

On March 6, 2000, Maxwell-Perkins began her detail at the textile care plant,[5] where she was not required to wear a uniform. Textile care is in a separate building, located a distance from the hospital/clinics and administrative offices. The employees working there did not interact with patients or health care providers. Maxwell-Perkins performed tasks assigned by Evans-Webb. Her performance evaluation for the rating period April 1, 2000 through March 31, 2001 notes that Plaintiff had been "responsible for scheduling, recording and documenting training classes; tracking and trending data and quality assurance information; assisted in drafting correspondence for business communication in the proper format" and that she had successfully completed her tasks.

While on detail, Plaintiff retained the title of section chief, her hourly pay rate remained the same, and she worked the same number of hours per week. However, because the Laundry is a weekday operation, working on Sundays is not necessary so Plaintiff did not receive weekend premium pay like she had in her previous position. She also did not receive any holiday, double time, or overtime pay. When Williams detailed York to a nonsupervisory position in engineering, he handled administrative matters and did not serve in a supervisory capacity. Like Plaintiff, York maintained the same pay rate, grade, and title of section chief. At some point, Williams left the position of Acting Chief of EMS, and in July 2002, Maxwell-Perkins returned to working as a housekeeping section chief in Building 1.

---

[5] At all relevant times, Geraldine (Darlene) Evans-Webb was the Textile Care Plant Manager. She had requested help in her area, and when Williams became Acting Chief of EMS, Evans-Webb told him that she needed assistance with administrative matters and that she understood Maxwell-Perkins had the skills to handle paperwork

**Sick Leave Restriction and AWOL Status**

Per Williams' instruction, Dunson verbally counseled Maxwell-Perkins regarding her excessive use of sick leave from the period December 1998 though June 1, 1999, and provided her with a sick leave counseling memorandum dated February 1, 2000.[6] A month later, Plaintiff was issued a Sick Leave Restriction Notice, which informed her that future sick leave requests required an acceptable physician's statement. If and/or when Plaintiff used sick leave, the time card initially would show "AWOL," which would be converted to sick leave after a review of submitted medical statements. For example, when Maxwell-Perkins did not come to work March 8-10, 2000, she was initially charged AWOL until she provided documentation relating to her absence. At that time, her leave status was converted to leave without pay (LWOP).

**Housekeeping Section Chief Training and Meetings**

While Maxwell-Perkins was working in textile care, Williams excluded her from housekeeping section chief training because she was not performing duties in housekeeping. She did, however, attend training in textile care. On at least two occasions, Williams asked Maxwell-Perkins to leave the supervisors' meetings because "[they] didn't have anything to do with [her]" and because "she didn't need to be [there]." When she was asked to leave the meetings, other females were present. Williams also has dismissed Anderson and York from supervisors' meetings on occasion.

---

[6]Plaintiff denies she received counseling; she asserts that all Dunson told her was, "Babe, you need to watch your leave."

## Alleged Harassment

Maxwell-Perkins contends that Williams engaged in sexual harassing behavior by making comments to others about her that "were sexual in nature, which alluded back to about something that happened [between them] 17 or 18 years ago." Further, sometime in March 2000, two VA employees told Plaintiff that they had been at a meeting with Williams a few days earlier where Williams said "he had a section chief who he told to put on a uniform and she fell out in his office crying." The employees also told Plaintiff that Williams said "who the hell does she think she is? She go around here collecting other men's checks and she must think her pussy is gold, but not here it's not."

At all relevant times, Williams never touched Plaintiff in a sexually provocative manner, nor did he make any sexual advances toward her. He never made sexually offensive comments to her, or in her presence, and he never otherwise acted sexually inappropriate toward her.

Plaintiff contends that, on occasion, Williams made derogatory comments about her; humiliated her in front of the laundry staff by telling them she had no supervisory authority, and made negative comments to her on the telephone when he called the textile care plant and she happened to answer. Specifically, between March 2000 and July 2002, Plaintiff recalls only one occasion when Williams made humiliating and offensive comments about her in the laundry staff's presence, and she stated that Williams came to the laundry two or three times when she was not present and made comments about her.

Plaintiff also contends that Williams denied her permission to attend the funeral of a co-worker's parent when she requested leave over telephone but did not submit a request for annual leave.

9

**Previous Equal Employment Opportunity Commission Activity**

When Maxwell-Perkins worked as a medical clerk on the nursing service, she filed an informal EEO complaint, which was settled in July 1996. Williams was not involved with the 1996 claim in any capacity, and at the time Williams detailed Plaintiff to the textile care plant, he did not know that she had engaged in prior EEO activity. In fact, Maxwell-Perkins admits that Williams did not retaliate against her for her 1996 EEO activity.

On February 8, 2000 and March 6, 2000, Plaintiff made informal complaints in connection with her assigned duties and the uniform issue. In these complaints, Plaintiff alleged harassment and hostile work environment on account of her gender, disability (shoulder rotator cuff and major depression), and reprisal for prior EEO activity (1996). On March 13, 2000, Plaintiff filed a formal EEO complaint, alleging discrimination based on reprisal, handicap, gender, and harassment. This EEO complaint was amended on April 4, 2000 to include allegations regarding the sick leave restriction and AWOL status.

Williams was involved in another employment discrimination case, Johnson v. West, 218 F.3d 725 (7th Cir. 2000), where it was determined that Williams sexually harassed a subordinate female employee by creating a hostile work environment and that he retaliated against her for filing charges of discrimination.

### III. Discussion

Maxwell-Perkins' Complaint alleges three discrimination claims: (1) requiring her to wear a uniform because of her gender; (2) retaliating against her because of her EEO activity; and (3) creating a hostile work environment because of her gender. The facts supporting these claims overlap to a fair extent, but the Court nonetheless addresses each claim in turn.

## A.    Discrimination Claim - Uniform Requirement & Reassignment

Plaintiff alleges that Defendant required her to wear a uniform and later reassigned her because of her gender. Maxwell-Perkins, having no direct evidence to support these assertions, must proceed under the burden-shifting method articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973).[7] In this method, the Plaintiff must first establish a *prima facie* case of discrimination. The establishment of a *prima facie* case creates a rebuttable presumption "that the employer's actions, if unexplained, were the result of impermissible factors". Grayson v. City of Chicago, 317 F.3d 745, 748 (7th Cir. 2003). Next, the burden shifts to the Defendant to proffer legitimate nondiscriminatory reasons for its actions. If Defendant proffers such reasons, the burden shifts back to the Plaintiff to demonstrate that those reasons are pretextual. See Peters v. Renaissance Hotel Operating Co., 307 F.3d 535, 544 (7th Cir. 2002).

In order to establish a *prima facie* case of gender discrimination, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was performing her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male employees. Markel v. Bd. of Regents of the Univ. of Wisc. Sys., 276 F.3d 906, 911 (7th Cir. 2002).

---

[7] While Plaintiff introduces evidence that Williams, the person who established the uniform policy, made a disparaging remark to others about Plaintiff's gender when she refused to wear a uniform (i.e., "she must think her pussy is gold, but not here it's not."), this isolated statement was made *after* the policy was established and after Plaintiff refused to wear the uniform. See Conley v. Vill. of Bedford Park, 215 F.3d 703, 711 (7th Cir. 2000) (stating that to rise to the level of direct evidence of discrimination, "isolated comments must be contemporaneous with the [adverse action] or causally related to the [applicable] decision-making process"). Further, Plaintiff herself concedes there is no direct evidence by proceeding solely on the indirect method of proof.

## 1. The Uniform Requirement

Plaintiff fails to state a *prima facie* case of gender discrimination regarding the uniform requirement. Although she is a member of a protected class and was performing her job satisfactorily, Plaintiff does not show that she suffered an adverse employment action or that she was treated less favorably than similarly situated male employees. First, a uniform requirement is not an adverse employment action. "The definition of an adverse employment action is generous, but it is still subject to certain limitations." Johnson v. Cambridge Industries, Inc., 325 F.3d 892, 901 (7th Cir. 2003). Indeed, a plaintiff must show some "quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference." Id. (holding that a requirement to wear safety goggles is not an adverse employment action). Here, Plaintiff does not show that being required to wear a uniform materially changed the terms or conditions of her employment.[8]

Second, Maxwell-Perkins cannot show that similarly situated males were treated more favorably. The uncontroverted evidence shows that Williams did not single out Plaintiff to wear a uniform. Rather, Williams required all section chiefs to wear uniforms when performing housekeeping duties, and the fact that uniforms had not been required before is of no moment. Plaintiff attempts to distinguish herself from her male peers by arguing that they did not wear their uniforms at all times. This distinction is a red herring, however, because Plaintiff was not

---

[8] Plaintiff's argument that, because of her mental condition regarding uniforms, this requirement uniquely adversely impacted her employment is without merit. First, short of Plaintiff's bald assertion, there is no evidence that Williams knew about Plaintiff's condition. Second, even if he were aware, it may be evidence that could support a discrimination claim based on disability, not gender. The Court will not allow Plaintiff to shoehorn a disability action into a gender discrimination claim.

reassigned to the textile care plant for failing to wear a uniform at all times. She refused to wear a uniform--ever. The record shows that, of all the section chiefs, Maxwell-Perkins is the only one who did not comply with the uniform requirement. Even after making all inferences in favor of Plaintiff, the other section chiefs at least partially complied with the uniform requirement. Maxwell-Perkins offers no evidence that she asked Williams if she could wear a uniform only sometimes and he refused. Thus, Plaintiff cannot establish that she was treated less favorably than her male counterparts. As a result, her gender discrimination claim as to the uniform requirement fails as a matter of law.

Although Plaintiff cannot establish a *prima facie* case that Defendant discriminated against her because of her gender in requiring her to wear a uniform, Defendant has nevertheless provided legitimate, nondiscriminatory reasons for establishing the uniform requirement. Namely, Williams wanted section chiefs to wear uniforms while training staff and performing housekeeping duties in the hospital/clinic areas for identification purposes and uniformity. He also decided that the uniform requirement would help boost the morale of the housekeeping aides and improve the relationship between the supervisors and their staff. Short of labeling Williams' a "known sexual harasser and retaliator," Plaintiff makes no effort to establish that Defendant's proffered reasons for establishing the uniform policy were pretextual.

## 2. The Reassignment

Plaintiff also contends Defendant discriminated against her because of her gender in reassigning her to the textile care plant. As with the uniform requirement, Defendant argues that Plaintiff cannot state a *prima facie* case of gender discrimination as to her reassignment because

she did not suffer an adverse employment action and she cannot establish she was treated less favorably than similarly situated male employees.

The Court finds that Plaintiff's reassignment constituted an adverse employment action. Ordinarily, "[a] transfer involving no reduction in pay and no more than a minor change in working conditions" dose not rise to the level of a materially adverse employment action. Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996). In this case, however, although Plaintiff retained the same title, hourly pay rate, and number of regular work hours per week, because of the new detail, she no longer was eligible for holiday, double time, or overtime pay. This change in compensation is significant because, according to Maxwell-Perkins, she lost approximately 25% of her salary by not being able to collect premium pay. Further, Plaintiff was relegated from a supervisory position to a nonsupervisory position, which indicates a demotion of substance in her employment if not form  Thus, based on the circumstances in this case, the Court finds that Plaintiff's reassignment to the textile care plant constituted an adverse employment action.

However, Plaintiff cannot state a *prima facie* case of gender discrimination regarding her reassignment because she cannot show she was treated less favorably than her male counterparts. Namely, the record shows that York, who was a section chief like Plaintiff, also was reassigned to another detail. Like Plaintiff, while on detail in engineering, York kept his section chief title, grade, and pay rate. Further, while Plaintiff baldly asserts that no other section chief was denied pay as Plaintiff was, the record is devoid of evidence that York did in fact receive premium pay while on engineering detail.

14

Even if Plaintiff established a *prima facie* case of gender discrimination with regard to her reassignment, Defendant has articulated a legitimate, nondiscriminatory reason for reassigning her. After wearing a uniform became a job requirement for all section chiefs, Williams gave Plaintiff additional time to comply with this requirement and provide sufficient medical documentation. Only after Plaintiff failed to comply was she assigned to the textile care plant.[9] Thus, Defendant's reason in reassigning Plaintiff was to accommodate her uniform anxiety. The record shows that a uniform was not required in the textile care plant, Maxwell-Perkins had the necessary skills to perform the duties of that position, and the plant manager needed administrative help and had requested Plaintiff be assigned there.

Once Defendant articulates a legitimate, nondiscriminatory reason for Plaintiff's reassignment, the burden shifts to the Plaintiff to prove that reason is pretextual. Peters, 307 F.3d at 544. Plaintiff does not meet her burden. Rather, Plaintiff essentially argues that, because Williams was found to sexually harass a female subordinate in the past, an issue of fact exists here. This clearly will not fly. In order to proceed to trial, Plaintiff must present evidence from which a jury could infer Williams discriminated against *Maxwell-Perkins*; mere speculation that he may be lying, despite evidence in the record that corroborates Williams' assertions, is not enough. Thus, the Court grants summary judgment in favor of Defendant on Plaintiff's gender discrimination claim.

---

[9] Plaintiff's claim that her medical documentation was sufficient and that Williams refusal to accept it may have supported a discrimination claim based on disability, but it does not cast an inference of gender discrimination. As stated *supra* note 8, this Court will not convert a gender discrimination claim into an ADA claim.

## B.     Plaintiff's Retaliation Claim

Plaintiff alleges that Defendant retaliated against her for engaging in statutorily protected activity.  The alleged retaliation took many forms: (1) reassigning Plaintiff to the textile care plant; (2) rejecting Plaintiff's doctors' statements regarding her uniform anxiety; (3) placing Plaintiff on sick leave restriction and AWOL for March 8-10, 2000; (4) denying her premium, holiday, and overtime pay; and (5) excluding her from housekeeping training and supervisors' meetings while she was on detail.

As with her gender discrimination claim, Plaintiff can survive summary judgment on the retaliation claim in two ways: through direct evidence of retaliation or indirect evidence under McDonnell-Douglas.  See Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002).  As Plaintiff offers no direct evidence of retaliation, she proceeds under the indirect method of proof.

To establish retaliation under the McDonnell-Douglas framework, Plaintiff must show that: (1) she engaged in a statutorily protected activity, (2) she was subjected to an adverse employment action, (3) she was performing her job in a satisfactory manner, and (4) she was treated less favorably than any other similarly situated employee who did not engage in such protected activity.  Id.  If the plaintiff establishes a *prima facie* case of retaliation, the defendant must put forth a legitimate non-discriminatory reason for the adverse employment action. "If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, [it] is entitled to summary judgment. Otherwise, there must be a trial." Id.  A causal link between the protected expression and adverse employment action is not required in the second method.  Id.

Neither party disputes that Maxwell-Perkins engaged in statutorily protected activity (she filed EEO complaints in February and March 2000) or that she was performing her job satisfactorily. Defendant, however, argues that Plaintiff fails to demonstrate that she suffered an adverse employment action and that she was treated less favorably than similarly situated employees who did not complain. This Court addresses each element in turn.

1. Adverse Employment Actions

As stated previously, the range of employer conduct that constitutes adverse employment actions is broad, but not unlimited. Johnson, 325 F.3d at 902 (citing Haugerud v. Amery Sch. Dist., 259 F.3d 678, 691 (7th Cir. 2001)). Examples of materially adverse employment actions are: "a less distinguished title, a material loss of benefits, significantly diminished material responsibilities," etc. Id. (citing Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993). Further, although "in the retaliation context, . . . the adverse action or harm that an employee suffers will not always be employment-related," the employee still "must complain of some action on the employer's part that causes her to suffer a real harm." Id.

In this case, as discussed above, the Court finds that Plaintiff establishes she suffered an adverse employment action; namely, her reassignment, which includes denial of holiday, double time, and overtime pay. The other actions Plaintiff identifies, however, do not constitute adverse employment actions and the Court disposes of them quickly. First, Williams' rejection of her doctors' statements occurred prior to Plaintiff's relevant EEO activity.[10] Second, Plaintiff was excluded from housekeeping training and supervisors' meetings because they were not relevant

---

[10] While Plaintiff did engage in EEO activity in 1996, she concedes that Williams did not retaliate against her for that activity. The Court therefore does not consider Plaintiff's 1996 EEO activity in this retaliation claim.

17

to her position in the textile care plant. As this exclusion did not deprive Plaintiff of the ability to perform essential job functions, see Johnson v. City of Fort Wayne, 91 F.3d 922, 932-33 (7th Cir. 1996), it did not constitute an adverse employment action. Third, being placed on sick leave restriction merely required Plaintiff to comply with an additional procedural requirement and did not materially alter her terms or conditions of employment. See Longstreet v. Ill. Dept. of Corrections, 276 F.3d 379, 384 (7th Cir. 2002) (holding that requiring an employee to substantiate that her absences from work were illness-related did not result in tangible job consequences and therefore was not an actionable adverse employment action).

## 2. Treatment of Similarly Situated Employees

Even though Plaintiff can establish she suffered an adverse employment action, she still fails to state a *prima facie* case of retaliation if she cannot establish she was treated less favorably than similarly situated employees who did not complain. Unfortunately for Plaintiff, as discussed regarding the reassignment of York, see *supra* A.2., Plaintiff cannot establish this fourth element. Because Plaintiff has failed to establish a *prima facie* case of retaliation, Defendant is entitled to summary judgment on this claim as well.[11]

### C. Plaintiff's Hostile Work Environment Claim

Plaintiff's final allegation is that Williams created a hostile work environment that thereby constituted sexual harassment. This claim, however, is patently without merit. To state a hostile environment sexual harassment claim, a plaintiff must demonstrate that a co-worker or supervisor harassed her because of her sex. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S.

---

[11] Even if Plaintiff established a *prima facie* case of retaliation, for the reasons discussed *supra* A.2, Defendant is entitled to summary judgment because Plaintiff cannot demonstrate Defendant's articulated legitimate reason was pretextual.

75, 81 (1998). Further, this harassment must be "so severe or pervasive as to alter the conditions of [her] employment and create an abusive working environment." Hilt-Dyson v. City of Chicago, 282 F.3d 456, 462-63 (7th Cir. 2003) (citations omitted). Indeed, "a hostile work environment is one that is 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Id.

In determining whether contested conduct actually creates an objectively hostile work environment, a number of factors may be considered including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).

In this case, evidence in support of this claim is scant. Most obvious is the one sexually-offensive comment Williams made that was overheard by two other employees. This comment was made outside Plaintiff's presence and she did not learn of it until days after its utterance. Similarly, Williams allegedly made comments to others about Plaintiff at some point that "were sexual in nature, which alluded back to about something that happened [between them] 17 or 18 years ago." However, Williams never touched Plaintiff in a sexually provocative manner, nor did he make any sexual advances toward her. He never made sexually offensive comments to her, or in her presence, and he never otherwise acted sexually inappropriate toward her.

Plaintiff also contends that, on occasion, Williams made derogatory comments about her; humiliated her in front of the laundry staff by telling them she had no supervisory authority, and made negative comments to her on the telephone when he called the textile care plant and she happened to answer. Plaintiff herself concedes, though, that she had limited and infrequent

19

dealings with Williams. Thus, the Court finds that any annoying conduct by Williams toward

Maxwell-Perkins was so infrequent and often indirect that it did not rise to the level of severe or

pervasive that would create a hostile work environment. Finally, as with her other two claims,

the Court refuses to allow Plaintiff to proceed on the mere speculation that, because Williams

was found to have created a hostile work environment for one female employee, he could be

doing so here. The Court therefore grants summary judgment in favor of Defendant on

Plaintiff's hostile environment claim.

## IV. Conclusion

For the reasons given above, Defendant's Motion for Summary Judgment is granted in its

entirety. This case is closed.

**Enter:**

**David H. Coar**
**United States District Judge**

**Dated: May 19, 2003**